1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL OLDS,<br><br>                    Plaintiff,<br><br>          v.<br><br>3M COMPANY a/k/a MINNESOTA<br>MINING AND MANUFACTURING<br>COMPANY, et al.<br><br>                    Defendants. | CASE NO.  CV-12-08539 R (MRWx)<br><br>Hon. Manuel L. Real<br>Courtroom:  8<br><br>**ORDER GRANTING LOCKHEED<br>MARTIN CORPORATION'S MOTION<br>FOR SUMMARY JUDGMENT AND<br>STATEMENT OF<br>UNCONTROVERTED FACTS AND<br>CONCLUSIONS OF LAW** |

Defendant Lockheed Martin Corporation's Motion for Summary Judgment ("the Motion") came on regularly for hearing on August 19, 2013, before the Honorable Manuel L. Real, presiding in Department 8 of the United States District Court for the Central District of California.  All appearances are as reflected in the record.

The Court, having read and considered all papers filed in support of and in opposition to the Motion, all admissible evidence filed in support of and in opposition to the Motion, and argument of counsel, IT IS HEREBY ORDERED THAT the

Motion is GRANTED and that judgment be entered in favor of Lockheed Martin Corporation.

The Court's ruling granting Lockheed Martin Corporation's Motion for Summary Judgment is based on the findings of uncontroverted facts and conclusions of law set forth below, and as stated on the record at the August 19, 2013 hearing on the Motion for Summary Judgment.

## UNCONTROVERTED FACTS

**ISSUE:** All of Plaintiff's causes of action against Lockheed Martin (negligence, strict products liability, and breach of warranty) fail for lack of causation because Plaintiff has no evidence that he was exposed to any asbestos-containing products for which Lockheed Martin is responsible.

| <u>MATERIAL FACTS</u>: | <u>SUPPORTING EVIDENCE</u>: |
|---|---|
| 1. Paul Olds ("Plaintiff") sues approximately forty-five defendants, including Lockheed Martin, for damages related to his alleged asbestos exposure. | **Plaintiff's Complaint [Docket No. 1],** excerpts attached as Exhibit 1 to Declaration of Deborah M. Parker ("Parker Decl.") at pp. 5:14-8:23 and 11:4-16:20. |
| 2. Plaintiff alleges that he was exposed to asbestos while serving in the United States Air Force ("USAF") from 1948 to 1968. | **Plaintiff's Complaint [Docket No. 1],** excerpts attached as Exhibit 1 to Parker Decl. at p. 9:21-22. |
| 3. As to Lockheed Martin, Plaintiff alleges that, during his USAF service, he worked "with and around asbestos-containing Lockheed | **Plaintiff's Complaint [Docket No. 1],** excerpts attached as Exhibit 1 to Parker Decl. at p. 10:4-6. |

| | |
|---|---|
| aircraft engines, including, but not limited to, the Lockheed F-80 engines, for which plaintiff contends Lockheed Martin Corporation is now legally responsible." | |
| 4.  Plaintiff's deposition occurred on January 15 through January 18, 2013. | **Deposition of Paul Olds**, excerpts attached as Exhibit 2 to Parker Decl. ("Plaintiff's Depo.") at pp. 18-19:18-19; 24-25:18-19;  63-64:18-19; and 66-67:18-19. |
| 5.  Plaintiff worked on only one aircraft type manufactured by Lockheed Martin:  the F-80 Shooting Star. | **Declaration of Valentino Jimenez** ("Jimenez Decl."), at ¶ 22. |

### F-80 SHOOTING STAR MILITARY AIRCRAFT

| | |
|---|---|
| 6.     Plaintiff testified that, while stationed at Williams Air Field from November of 1948 through August of 1950, he worked on F-80A,  F-80B, and F-80C aircraft (hereinafter, "F-80"). | **Plaintiff's Depo.,** Vol. II at 26:14-27:1; 27:10-15.<br><br>Q.   Okay.  Sir, am I correct that the next Air Force base that you were assigned to was Williams Field in Arizona?<br>A.   Correct.<br>Q.   And you believe that you arrived there in approximately October 1948?<br>A.   Probably November.  I took a leave.<br>Q.   So your best estimate is November 1948?<br>A.   Right.<br>Q.   Yesterday you indicated that you believed you left there in August 1950.  Does that still sound |

| | |
|---|---|
| | accurate? |
| | **A.** Correct. |
| | (*Id*. at 26:14-27:1.) |
| | ***** |
| | **Q.** Do you recall the model or model number of any of the aircraft that you performed hands-on work to? |
| | **A.** Yes. |
| | **Q.** Could you please tell me. |
| | **A.** F-80A, -B, and –C, all three of them. |
| | (*Id*. at 26:10-15.) |
| 7.   Plaintiff testified that all F-80 aircraft he encountered were Military aircraft. | **Plaintiff's Depo.,** Vol. II at 29:15-17. <br><br> **Q.** Would you agree with me that an F-80 aircraft is a military aircraft? <br> **A.** Yes. |
| 8.   Plaintiff testified that he does not know how many F-80 aircraft were present at Williams Field. | **Plaintiff's Depo.,** Vol. II at 27:23-28:5. <br><br> **Q.** With respect to the F-80As that were present at Williams Field, how many were there, if you know? <br> **A.** I have no idea. <br> **Q.** Okay.  Is it also fair to say you don't know how many F-80Bs or F-80Cs were at Williams Field? <br> **A.** You're correct. |
| 9.   Plaintiff testified that he does not know the construction serial number, Military serial number, or tail number of any F-80 aircraft that was present at Williams Field. | **Plaintiff's Depo.,** Vol. II at 28:11-19. <br><br> **Q.** Do you know the construction serial number of any of those aircraft? <br> **A.** No. <br> **Q.** Do you know the military serial number of any of those aircraft? <br> **A.** No. <br> **Q.** Do you know the tail number of any of those military F-80s? |

**[PROPOSED] ORDER GRANTING LOCKHEED MARTIN CORPORATION'S MOTION FOR SUMMARY JUDGMENT; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**

| | |
|---|---|
| | **A.**   No. |
| 10.   Plaintiff testified that, with respect to all of the F-80 aircraft he encountered, he does not know the maintenance history of any of those aircraft prior to encountering them. | **Plaintiff's Depo.,** Vol. II at 30:4-10.<br><br>**Q.**   You would agree with me that with respect to all the F-80s that you encountered, you do not know the maintenance history of that aircraft prior to your encountering it –<br>**A.**   No.<br>**Q.**    -- true?<br>**A.**   You're correct. |
| 11.   Plaintiff testified that he has no information or knowledge that any of the F-80 aircraft or F-80 aircraft components were original factory installed equipment. | **Plaintiff's Depo.,** Vol. II at 30:20-24.<br><br>**Q.**   Okay.  So that is fair to say that you do not have any information or knowledge as to whether any of the F-80s or their parts were original factory-installed equipment; true?<br>**A.**   You're correct.  I have no knowledge. |
| 12.   Plaintiff testified that, while stationed at Williams Field (1948-1950), he went to Smoky Hill Air Force Base for one week where he worked on one F-80 aircraft. | **Plaintiff's Depo.,** Vol. II at 45:6-7, 11-17; 46:6-11, 20-21.<br><br>**Q.**   Now, I understand you don't recall when you were at Smoky Hill, but can you tell me if it was that the beginning, middle, or end of your military service?  And if you can't, it's okay, sir.<br>**A.**   It was when I was stationed in William Field at the beginning.<br><br>(*Id.* at 45:11-17.)<br><br>                    *****<br>**Q.**   Do you recall how long you were there?<br>**A.**   A week. |

**[PROPOSED] ORDER GRANTING LOCKHEED MARTIN CORPORATION'S MOTION FOR SUMMARY
JUDGMENT; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**

| | | |
|---|---|---|
| | | (*Id*. at 45:6-7.) |
| | | ***** |
| | | **Q**. Okay. Did you perform any work to the Lockheed aircraft that was at Smoky Hill? |
| | | **A**. Yes. |
| | | **Q**. Okay. Let's talk about the aircraft. What kind of aircraft was it? |
| | | **A**. F-80. |
| | | (*Id*. at 46:6-11.) |
| | | ***** |
| | | **Q**. How many F-80s were there? |
| | | **A**. One. |
| | | (*Id*. at 46:20-21.) |
| 13. | Plaintiff testified that he does not know the construction serial number, Military serial number, tail number, or sub-designation of the F-80 aircraft that was present at Smoky Hill. | **Plaintiff's Depo.,** Vol. II at 46:22-47:5.<br><br>**Q**. Okay. Do you recall its construction serial number?<br>**A**. No.<br>**Q**. Military serial number?<br>**A**. No.<br>**Q**. Tail number?<br>**A**. No.<br>**Q**. Sub-designation?<br>**A**. No. .... |
| 14. | Plaintiff admits that he does not know the maintenance history of the F-80 that was at Smoky Hill or whether any of the F-80 components were original factory installed items. | **Plaintiff's Depo.,** Vol. II at 53:12-15; 54:9-18.<br><br>**Q**. Also fair to say, sir, that you do not know the maintenance history of the F-80 that was at Smoky Hill; true?<br><br>**A**. True.<br><br>(*Id*. at 53:12-15.) |

6

| | |
|---|---|
| | ***** |
| | **Q.** Sir, the F-80 that was at Smoky Hill, you have no personal knowledge or information as to its maintenance history or whether any of its products or equipment were the actual products and equipment that were originally installed at the Lockheed production facility; true? Mr. Green: Asked and answered. |
| | **A.** I don't know, to be honest. There's -- I'm not speculating, but I don't know the answer. |
| | (*Id.* at 54:9-18.) |
| 15. During the 1940's through 1951, Lockheed Martin delivered to the USAF, and the USAF accepted and placed into Military service, over 1,700 F-80 aircraft. | **Jimenez Decl., ¶ 15.** |
| 16. Upon delivery to the Military, each F-80 aircraft was equipped with numerous components manufactured and supplied by multiple different companies unrelated to Lockheed Martin. | **Jimenez Decl., ¶ 20.** |
| 17. After aircraft delivery to the Military, many of the F-80 components were replaced numerous times for numerous reasons including but not limited to: scheduled maintenance, test flight | **Jimenez Decl., ¶ 20.** |

**[PROPOSED] ORDER GRANTING LOCKHEED MARTIN CORPORATION'S MOTION FOR SUMMARY JUDGMENT; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**

| | |
|---|---|
| inspections, component life cycle, and corrective maintenance. | |
| 18. F-80 aircraft components subject to replacement, and which often were replaced, after aircraft delivery to the Military, include: whole and complete engines, engine assemblies and sub-assemblies (such as the starter assembly, hydraulic pump assembly, hose assemblies, electrical connection assemblies, and blankets), gaskets, seals, and clamps. | **Jimenez Decl.,** ¶ 20. |
| 19. Lockheed Martin never supplied the Military with any F-80 replacement engines or engine accessories, such as the starter and hydraulic pump assemblies. Rather, to ensure mission accomplishment, the Military always had (and still has) multiple component distribution/vendor sources at their immediate disposal for such components, including the specific component manufacturer. | **Jimenez Decl.,** ¶ 20. |
| 20. Plaintiff testified that, at Williams Field, all of his F-80 aircraft work | **Plaintiff's Depo.,** Vol. II at 32:13-19; 34:9-11; 35:21-36:8. |

8

| | |
|---|---|
| was related to helping remove the engine from the aircraft fuselage. Specifically, Plaintiff testified that his job was disconnecting the fuselage aft section from the fuselage mid section. | **Q.** You indicated that you performed some hands-on work to the F-80 aircraft at Williams Fields. <br> **A.** Correct. <br> **Q.** Can you specifically distinguish the work you performed on the F-80A versus the F-80B verses the F-80C? <br> **A.** All the same. <br><br> (*Id.* at 32:13-19.) <br><br> ***** <br> **Q.** Okay.  And your work was with respect to the engines that power this aircraft? <br> **A.** Yes. <br><br> (*Id.* at 34:9-11.) <br><br> ***** <br> **Q.** Okay.  But, as you sit here today, you cannot recall any specific task or duty that you performed to that engine; true? <br> **A.** No. To remove that engine from the aircraft, everybody has a specific job to do.  Some of them were on the front of the engine, some of them with the motor mounts.  And my job was taking the aft section off. <br> **Q.** Okay.  That's a perfect example of a detailed task.  You recall specifically removing the aft fuselage section from the mid-fuselage section? <br> **A.** Yes. <br><br> (*Id.* at 35:21-36:8.) |
| 21.  Plaintiff testified that the aft fuselage section is made of all | **Plaintiff's Depo.,** Vol. II at 36:9-11. |

| | | |
|---|---|---|
| | metal. | **Q.** Okay. And, sir you would agree with me that the aft fuselage section is made of all metal?<br>**A.** Correct. |
| 22. | Plaintiff testified that the mid fuselage section is made of all metal. | **Plaintiff's Depo.,** Vol. II at 36:12-14.<br><br>**Q.** And the mid-fuselage section is made of all metal?<br>**A.** Correct. |
| 23. | Plaintiff testified that the task of removing the aft fuselage section from the mid-fuselage section is a "fairly simple and quick task." | **Plaintiff's Depo.,** Vol. II at 36:15-19.<br><br>**Q.** And you would agree with me that the task of removing the aft fuselage section from the mid-fuselage section is a fairly simple and quick task?<br>**A.** Yes. |
| 24. | Plaintiff testified that, to disconnect the F-80 aft fuselage section from the mid fuselage section, the first task he specifically recalls performing was opening an access panel to access and disconnect the rudder cable, elevator rod, and aileron cables. | **Plaintiff's Depo.,** Vol. II at 37:24-38:7; 38:11-21.<br><br>**Q.** Okay. Now, let me make sure I have the universe of tasks that you specifically recall performing with respect to the removal of the F-80 aft fuselage section from the mid-fuselage section.<br>**A.** Correct.<br>**Q.** The first thing you would do would open up an access panel?<br>**A.** Correct.<br>**Q.** In order to access the rudder cable, the elevator rod, and the aileron cables; true?<br>**A.** Correct.<br><br>(*Id.* at 38:11-21.)<br><br>*****<br>**Q.** Okay. So you disconnected the rudder cables? |

10

| | | |
|---|---|---|
| | | **A.**  Correct. |
| | | **Q.**  You disconnected the cables for the ailerons? |
| | | **A.**  Correct. |
| | | **Q.**  And you disconnected the rod for the elevators? |
| | | **A.**  Correct. |
| | | (*Id.* at 37:24-38:7.) |
| 25. | Plaintiff admits that the entire exterior of the F-80 fuselage and all of the access panels on the exterior of the fuselage, including the specific access panel he opened to access and disconnect the rudder cable, elevator rod, and aileron cables are made of all-metal. | **Plaintiff's Depo.,** Vol. II at 31:6-20; 36:9-14; 38:22-39:1.<br><br>**Q.**  You would agree with me that the entire exterior of the aircraft fuselage is made of all metal?<br>**A.**  Correct.<br><br>(*Id.* at 31:6-9.)<br><br>*****<br>**Q.**  You would agree with me that all of the access panels on the exterior of the fuselage –<br>**A.**  Correct.<br>**Q.**  – are made of all metal –<br>**A.**  Correct.<br><br>(*Id.* at 31:16-20.)<br><br>*****<br>**Q.**  Okay.  You would agree with me that that access panel and panels that you had to open to disconnect the rudder, elevator, and aileron cables and rods is made of all metal?<br>**A.**  Aluminum, yes.<br><br>(*Id.* at 38:22-302:1.) |
| 26. | Plaintiff admits that the rudder | **Plaintiff's Depo.,** Vol. II at 39:6-14. |

**[PROPOSED] ORDER GRANTING LOCKHEED MARTIN CORPORATION'S MOTION FOR SUMMARY JUDGMENT; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**

| | |
|---|---|
| cable, elevator rod, and aileron cable are made of all metal. | **Q.** Very good.  You would agree with me that the rudder cable is made of all metal?<br>**A.** Oh, Correct.<br>**Q.** You would agree wit me that the elevator rod is made of all metal?<br>**A.** Correct.<br>**Q.** And you would agree with me that the aileron cable is made of all metal?<br>**A.** Correct. |
| 27.  Plaintiff admits that all of the hardware and fasteners associated with the rudder cable, elevator rod, and aileron cable are made of all metal. | **Plaintiff's Depo.,** Vol. II at 39:15-19.<br><br>**Q.** And you would agree with me that all of the hardware and fasteners associated with the ruder cable, the elevator rod, and the aileron cable are also made of all metal?<br>**A.** Correct. |
| 28.  All of the items Plaintiff testified to encountering to access and disconnect the rudder cable, aileron cables, and elevator rod are made of metal -- not asbestos. | **Jimenez Decl.,** ¶¶ 27 and 29. |
| 29.  The F-80 is powered by a single turbo jet engine (an Allison-manufactured J-33 engine), which is located entirely within the aircraft fuselage. Specifically, the engine is mounted on all-metal supports located in the aft portion of the fuselage mid section (i.e., | **Jimenez Decl.,** ¶ 27. |

**[PROPOSED] ORDER GRANTING LOCKHEED MARTIN CORPORATION'S MOTION FOR SUMMARY JUDGMENT; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**

| | | |
|---|---|---|
| | the engine bay). | |
| 30. | The F-80 aircraft fuselage is built into three separate sections: nose section, mid section, and aft section. | **Jimenez Decl., ¶ 27.** |
| 31. | The F-80 mid and aft fuselage sections are separable through three quickly detachable all-metal tension fittings to accommodate engine installation and removal. | **Jimenez Decl., ¶ 23.** |
| 32. | The F-80 fuselage is equipped with multiple access panels to accommodate access to various assemblies, subassemblies and components, including the flight control cables and rods. | **Jimenez Decl., ¶ 27.** |
| 33. | The entire F-80 fuselage structure, including all skin and access panels, is made of metal. Specifically, the fuselage skin and access panels are of aluminum alloy construction. | **Jimenez Decl., ¶ 27.** |
| 34. | All hardware and fasteners associated with the F-80 fuselage access panels are made of all metal. | **Jimenez Decl., ¶ 27.** |

**[PROPOSED] ORDER GRANTING LOCKHEED MARTIN CORPORATION'S MOTION FOR SUMMARY JUDGMENT; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**

| 35. | The F-80 aircraft rudder and aileron control systems cables are made of all-steel, and are equipped with corrosion-resistant steel fittings. | **Jimenez Decl.,** ¶ 29. |
|---|---|---|
| 36. | The F-80 rudder and aileron control cables are attached to all-metal structures with quick disconnect assemblies comprised of all-metal hardware/fasteners (e.g., bolts, screws and/or brackets).  These cables are disconnected by removing the all-metal hardware/fasteners. | **Jimenez Decl.,** ¶ 29. |
| 37. | The F-80 aircraft elevator control system contains a series of push-pull tubes or "rods" made of aluminum alloy and steel.  The elevator push-pull tubes are disconnected by removing all-metal bolts that attach the all-metal tubes to the all-metal arms. | **Jimenez Decl.,** ¶ 29. |
| 38. | Plaintiff testified that, after disconnecting the elevator rod, the next task he specifically recalls performing was disconnecting a hydraulic hose for the dive brake. | **Plaintiff's Depo.,** Vol. II at 38:5-39:24.<br><br>**Q.** And you disconnected the rod for the elevators?<br>**A.** Correct.<br>**Q.** Okay.<br>**A.** And there was one hydraulic hose for the dive brakes. |

14

| | | |
|---|---|---|
| | | **Q.** Okay. Now, let me make sure I have the universe of tasks that you specifically recall performing with respect to the removal of the F-80 aft fuselage section from the mid-fuselage section. |
| | | **A.** Correct. |
| | | (*Id.* at 38:5-15.) |
| | | ***** |
| | | **Q.** The next task you would do is you would disconnect a hydraulic hose – |
| | | **A.** Correct. |
| | | (*Id.* at 39:22-24.) |
| 39. | Plaintiff testified that, to disconnect the hydraulic hose, he loosened a B-nut attached to the hose. | **Plaintiff's Depo.,** Vol. II at 40:6-9.<br><br>**Q.** And in order to disconnect the hydraulic hose, it would – you would loosen the B-nut attached to it?<br>**A.** Correct. |
| 40. | Plaintiff admits that the exterior of the hydraulic hose, the B-nut and all other associated hardware, such as safety wire, are made of all-metal. | **Plaintiff's Depo.,** Vol. II at 40:10-14.<br><br>**Q.** You would agree with me that the exterior of the hydraulic hose and the B-nut and all other associated hardware, such as safety wire, is all made of metal; true?<br>**A.** Correct. |
| 41. | All of the items Plaintiff testified to encountering when disconnecting the dive brake hydraulic hose are made of metal - not asbestos. | **Jimenez Decl.,** ¶ 31. |

| | | |
|---|---|---|
| 42. | The F-80 is equipped with a dive flap assembly (also called dive brake assembly), which includes an all-metal hydraulic line equipped with all-metal fasteners and hardware, including an all-metal threaded B-nut coupling. | **Jimenez Decl.,** ¶ 31. |
| 43. | The dive brake assembly hydraulic line is disconnected from an all-metal dive brake actuator by loosening and removing the all-metal B-nut coupling. | **Jimenez Decl.,** ¶ 31. |
| 44. | Aircraft safety wire is an industry standard item made of high strength metal. | **Jimenez Decl.,** ¶ 31. |
| 45. | Plaintiff testified that, after removing the rudder cable, the elevator rod, the aileron cable, and the hydraulic hose, the next task he performed was opening up a large V-clamp that holds the tailpipe to engine exhaust cone. | **Plaintiff's Depo.,** Vol. II at 41:5-10.<br><br>**Q.** The next step you would do after removing the rudder cable, the elevator rod, the aileron cable, and the hydraulic hose would be to put your hand in there and open up the large V-clamp that holds the tailpipe to the exhaust cone?<br>**A.** Correct. |
| 46. | Plaintiff testified that, once the V-clamped is opened up, he would slide the V-Clamp off of the flange and onto the tailpipe and then slide the tailpipe back. | **Plaintiff's Depo.,** Vol. II at 41:11-20.<br><br>**Q.** And once that V-clamped is opened up, you would just slide it back onto the tailpipe, off of the flange, onto the tailpipe?<br>**A.** Correct. |

**[PROPOSED] ORDER GRANTING LOCKHEED MARTIN CORPORATION'S MOTION FOR SUMMARY JUDGMENT; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**

| | |
|---|---|
| | **Q.** Okay.  You didn't actually take the clamp off?<br>**A.** No.<br>**Q.** All right.<br>**A.** And you slid the tailpipe back after you got that done. |
| 47.   Plaintiff testified that he removed and replaced the exhaust blanket located on the tailpipe. | **Plaintiff's Depo.,** Vol. I at 20:11-16; 21:12-25.<br><br>**Q.** Were there ever any heat shields or insulating blankets you encountered on the fuselage of the F-80?<br><br>Ms.  Yee:  Objection: leading, overbroad, compound, lacks foundation.<br><br>The Deponent:  Just on the tailpipe.<br><br>(*Id.* at 20:11-16.)<br><br>*****<br>**Q.** And how would you go about disconnecting the insulating blankets on the F-80 tailpipe?<br>**A.** Well, the F-80 has a number of little boot hooks, and you would safety-wire it, and cut the wire, take it and undo it, we would lay it - hang it out on the ground, and take a piece of wood or anything you had to flatten it out so you could put it back on.  And it was wired on because the little hooks, real quick hook up.  Like a boot hook.<br>**Q.** And were these hooks were they part of the aircraft themselves?<br><br>Ms. Yee:  Objection. |

| | | |
|---|---|---|
| | | The Deponent: No.  Part of the insulating blanket.<br><br>(*Id*. at 21:12-25.) |
| 48. | Plaintiff testified that, to remove the blanket, he had to remove a thermocouple. | **Plaintiff's Depo.,** Vol. II at 60:1-61:6.<br><br>**Q.**  Sir, with respect to thermocouples that may have been present at any of the military bases, whether it's associated with aircraft or engines or something else, as you sit here today, you cannot specifically recall the manufacturer or the brand or the supplier of any of the thermocouples; true?<br>Mr. Green:  My objection is compound.<br>The Deponent:  No.<br>**Q.**  Okay.<br>**A.**  You want to know why?<br>**Q.**  Sure.<br>**A.**  When we get a newer airplane in, it comes directly from the manufacturer, and it would have manufacturer's units on it.  And like the F-80, we had six brand-new ones come in.  When we changed the engine or pulled the tailpipe off, we had to take the blanket off; right?  Take the exhaust blanket off. In order to do that, you got to disconnect the thermocouple.  I was thinking about that last night, that I lied to you yesterday.  But that's the only part that I ever come in contact with the thermocouples.<br>Ms. Yee - Okay, sir, I'll move to strike those portions that are nonresponsive and speculation. |
| 49. | Plaintiff admits that the V-clamp, | **Plaintiff's Depo.,** Vol. II at 41:21-42:3. |

| tailpipe, and exhaust cone are made of all-metal. | **Q.** Exactly.  Okay.  You would agree with me that the V-clamp that holds the tailpipe to the exhaust cone is made of all metal?<br>**A.** Correct.<br>**Q.** Okay.  You would also agree with me that the tailpipe and the exhaust cone are also made of all metal?<br>**A.** Correct. |
|---|---|
| 50. All of the items Plaintiff testified to encountering when opening up the V-clamp, sliding back the V-clamp and tailpipe, and removing the exhaust tailpipe blanket and thermocouple are made of metal and fiberglass -- not asbestos. | **Jimenez Decl., ¶¶ 33 and 35-36.** |
| 51. The F-80 is equipped with a 96" exhaust pipe (also referred to as exhaust tailpipe or tailpipe) that extends from the aft section of the engine to the aft extremity of the aft fuselage. | **Jimenez Decl., ¶ 33.** |
| 52. The F-80 exhaust tailpipe is made of metal; specifically, it is of corrosion resistant steel construction. | **Jimenez Decl., ¶ 33.** |
| 53. The F-80 is equipped with an all-metal V-clamp assembly (manufactured by Solar Aircraft), | **Jimenez Decl., ¶ 33.** |

| | | |
|---|---|---|
| | which is used to secure the exhaust tailpipe to a stainless steel tailpipe adapter or flange (manufactured by Solar Aircraft). | |
| 54. | The F-80 stainless steel tailpipe adapter/flange is attached to the stainless steel aft section of the engine. | **Jimenez Decl., ¶ 33.** |
| 55. | All hardware and fasteners associated with the V-clamp assembly are made of metal. | **Jimenez Decl., ¶ 33.** |
| 56. | The F-80 exhaust tail pipe blanket is made of fiberglass (interior material), and is enclosed by an all-metal cover (either aluminum alloy or stainless steel cover - depending on construction serial number). | **Jimenez Decl., ¶ 35.** |
| 57. | The exhaust tail pipe blanket is wrapped around the all-metal exhaust tail pipe and is secured with stainless steel or monel mesh lacing that is fastened/wrapped around metal hooks. | **Jimenez Decl., ¶ 35.** |
| 58. | The F-80 aircraft thermocouple circuit employs temperature indicators (located on the | **Jimenez Decl., ¶ 36.** |

20

| | |
|---|---|
| instrument panel) and General Electric-manufactured thermocouples that are located inside the all-metal exhaust tailpipe. | |
| 59. Each thermocouple houses all-metal elements (i.e., alumel and chromel) that transmit a temperature signal to the cockpit indicator. | **Jimenez Decl.,** ¶ 36. |
| 60. The thermocouple is removed by cutting all-metal safety wire, removing an all-metal B-nut, removing an all-metal washer, and pulling the thermocouple probe (which has an all-metal exterior surface) from the all-metal tailpipe attach fitting that is welded to the all-metal tailpipe structure. | **Jimenez Decl.,** ¶ 36. |
| 61. Plaintiff admits that he testified to all of the specific duties he recalls personally performing with respect the removal of the F-80 aft fuselage section from the mid-fuselage section. | **Plaintiff's Depo.,** Vol. II at 42:4-8.<br><br>**Q.** Okay. Have you now told me about all of the specific duties that you recall personally performing with respect to the removal of the F-80 aft<br>fuselage section from the mid-fuselage section?<br>**A.** That's all I would do. |
| 62. Plaintiff testified that, in | **Plaintiff's Depo.,** Vol. II at 42:9-24. |

| | |
|---|---|
| performing his duties, he saw the crew chief roll the aft-section stand under the aircraft and other mechanics loosen the aft-section fuselage bolts and engine mount bolts. | **Q.**  Thank you, sir.  Now, you indicated that in performing your duties, you saw some mechanics do other things.  For example, you saw the crew chief get the aft fuselage section stand and roll it underneath the aircraft. <br> **A.**  Correct. <br> **Q.**  Okay.  And you also saw other mechanics loosen the three engine mount bolts; true? <br> **A.**  Well, the aft section bolts first. <br> **Q.**  Okay.  And there's three aft section bolts? <br> **A.**  I don't remember. <br> **Q.**  Okay.  Either way, you had to loosen the bolts in order to disconnect the aft section – <br> **A.**  Right. |
| 63.  Plaintiff admits that all of the aft-section fuselage bolts and their associated hardware/safety wire, the engine mount bolts, and the interior engine bay wall are made of all-metal. | **Plaintiff's Depo.,** Vol. II at 42:25-43:17. <br><br> **Q.**  [Regarding aft section bolts] You would agree with me that those bolts and all the hardware and safety wire associated with them is made of all metal? <br> **A.**  Correct. <br> **Q.**  Okay.  You also indicated that you saw other mechanics loosen the three engine mount bolts; true? <br> **A.**  Correct. <br> **Q.**  Okay.  And those three engine mount bolts are what secure the engine to the engine bay? <br> **A.**  Correct. <br> **Q.**  Okay.  You would agree with me that those engine mount bolts are also made of all metal? |

**[PROPOSED] ORDER GRANTING LOCKHEED MARTIN CORPORATION'S MOTION FOR SUMMARY JUDGMENT; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**

| | | |
|---|---|---|
| | | **A.** Correct.<br>**Q.** Okay. And you would agree with me that the interior of the engine bay is a metal wall? It's a big tube?<br>**A.** Correct. |
| 64. | Plaintiff admits that he testified to all of the duties he performed and saw others perform with respect to the F-80 aircraft and its component parts while stationed at Williams field. | **Plaintiff's Depo.,** Vol. II at 44:8-13.<br><br>**Q.** Fair to say you have now told me all of the duties you performed and all of the duties you saw others perform with respect to F-80 aircraft and its component parts while you were stationed at Williams Field, Arizona; true?<br>**A.** True, as far as I can go. |
| 65. | All of the F-80 items Plaintiff testified to seeing other mechanics encounter when loosening the aft-section fuselage bolts and engine mount bolts are made of metal -- not asbestos. | **Jimenez Decl., ¶¶** 27 and 38-39. |
| 66. | The F-80 aircraft mid and aft fuselage sections are separated/connected through three attachment fittings (also called tension fittings) to accommodate engine installation and removal. | **Jimenez Decl., ¶¶** 23 and 34. |
| 67. | The F-80 tension fittings are integral to the all-metal fuselage structure and connected with mounting bolts and nuts (sometime referred to as aft or mid fuselage | **Jimenez Decl., ¶¶** 27 and 38. |

**[PROPOSED] ORDER GRANTING LOCKHEED MARTIN CORPORATION'S MOTION FOR SUMMARY JUDGMENT; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**

| | | |
|---|---|---|
| | mount bolts). | |
| 68. | The F-80 tension fittings and all associated hardware and fasteners, including the mount bolts and nuts, are made of metal. | **Jimenez Decl.,** ¶¶ 27 and 38. |
| 69. | The F-80 aircraft engine is located entirely in the fuselage and is mounted on three engine mount supports located in the aft section of the mid-fuselage section (i.e., the engine bay). | **Jimenez Decl.,** ¶¶ 27 and 39. |
| 70. | The F-80 aircraft engine mount supports are integral to the all-metal fuselage structure and are made of aluminum alloy and steel. | **Jimenez Decl.,** ¶¶ 27 and 39. |
| 71. | Each engine mount support is a hinged clam shell type assembly that, when closed, securely encloses an all-metal captive ball assembly, which is integral to the all-metal structure of the engine. | **Jimenez Decl.,** ¶¶ 27 and 39. |
| 72. | The fuselage aft section stand is ground equipment used to support and transport the fuselage aft section; it contains no asbestos. | **Jimenez Decl.,** ¶ 44. |
| 73. | Regarding Plaintiff's one week assignment at Smoky Hill, Plaintiff | **Plaintiff Depo.,** Vol. II at 47:23-48:22.<br><br>**Q.**  Sir, with respect to the one F-80 |

24

| | |
|---|---|
| testified that, in addition to removing the aft fuselage section from the mid fuselage section (which Plaintiff admits involved the exact same duties that he performed at Williams Field), he helped remove the engine from the engine bay and replaced engine components. | that was present at Smoky Hill during that one week that you were there, do you recall specifically the duties that you performed to that aircraft?<br>**A.** Yes.<br>**Q.** Okay. Was it removing the aft fuselage section from the mid-fuselage section?<br>**A.** Yes.<br>**Q.** So, sir, to save you time, is it fair to say that the duties that you performed to the F-80 aircraft at Smoky Hill, you have already described those duties fully and completely to me this morning when we were talking about your work on F-80 aircraft at Williams Field; true?<br>**A.** True.  Except that Smoky Hill would get a little bit more on it.<br>**Q.** Okay.  What other work do you specifically recall doing to the F-80 at Smoky Hill other than removing the aft section of the fuselage from the midsection of the fuselage?<br>**A.** Replacing components on the engine. After we removed it.<br>**Q.** Did you personally help remove the engine from the engine bay?<br>**A.** Yes. |
| 74.  Plaintiff testified that, in removing the engine from the engine bay, his hands-on duties were limited to disconnecting three engine bolts. | **Plaintiff Depo.,** Vol. II at 48:20-49:6.<br><br>**Q.** Did you personally help remove the engine from the engine bay?<br>**A.** Yes.<br>**Q.** Okay. And let's talk about that duty, and I don't want you to guess or speculate.  But would it be a fair and accurate summary to say that |

25

**[PROPOSED] ORDER GRANTING LOCKHEED MARTIN CORPORATION'S MOTION FOR SUMMARY JUDGMENT; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**

| | |
|---|---|
| | your hands-on duties for removing the engine were limited to the disconnecting the three engine bolts –<br><br>**A.** Correct.<br>**Q.** - engine mounts; true?<br>**A.** - Correct. |
| 75.  Plaintiff admits that the engine mount bolts, and all associated hardware, are made of all metal. | **Plaintiff Depo.**, Vol. II at 49:7-10.<br><br>**Q.** Okay.  And those engine mount bolts are - and all of the associated hardware are made of all metal, true?<br>**A.** True. |
| 76.  All of the F-80 items that Plaintiff testified to encountering when removing the aft fuselage section and disconnecting the engine mount bolts are made of metal and fiberglass - not asbestos. | **Jimenez Decl., ¶¶** 27, 29, 31, 33, 35-36, and 38-39. |
| 77.  Regarding engine component removal work at Smoky Hill, Plaintiff testified that he removed only three engine components: the starter, the hydraulic pump, and the hydraulic pump gasket. | **Plaintiff's Depo.**, Vol. II at 49:15-20; 51:8-17; 52:10-15.<br><br>**Q.** You indicated that some components were taken off of the engine.<br>**A.** Correct.<br>**Q.** Did you personally do that?<br>**A.** I removed the starter and the hydraulic pump.<br><br>(*Id* at 49:15-20.)<br><br>***** <br>**Q.** Sir, do you specifically recall removing the starter gasket on the engine that powered the F-80 when |

**[PROPOSED] ORDER GRANTING LOCKHEED MARTIN CORPORATION'S MOTION FOR SUMMARY JUDGMENT; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**

| | | |
|---|---|---|
| | | you were at Smoky Hill in Kansas? |
| | | **A.** No, I don't. |
| | | **Q.** Okay.  Thank you, sir. Sir as you sit here today, under oath, do you recall removing any other component or installing or handling any other component for the engine that powers the F-80 at Smoky Hill? |
| | | **A.** Hydraulic pump. |
| | | (*Id*. at 51:8-17.) |
| | | ***** |
| | | **Q.** Okay.  At you sit here today, sir, do you actually recall removing a hydraulic pump gasket? |
| | | **A.** Yes. |
| | | (*Id*. at 52:10-12.) |
| 78. | Plaintiff admits that, with respect to the F-80 at Smoky Hill, he testified to all of the components and parts that he specifically recalls handling and seeing others handle. | **Plaintiff's Depo.,** Vol. II at 55:15-19.<br><br>**Q.** All right.  Now with respect to the F-80 that was at Smoky Hill, have you now told me all of the components and parts that you specifically recall handling and see others handle?<br>**A.** Yes. |
| 79. | Plaintiff testified that the engine starter and hydraulic pump are attached to all-metal accessory pads located on the all-metal accessory gear drive. | **Plaintiff's Depo.,** Vol. II at 49:21-50: 6; 50:17-20; 51:19-52:4.<br><br>**Q.** You would agree with me that the mounting pad where the starter is attached to the accessory gear drive is made of all metal?<br>**A.** Yes.<br><br>(*Id*. at 50:17-20.)<br>***** |

27

| | |
|---|---|
| | **Q.** [Regarding hydraulic pump] You would agree with the accessory pad on the accessory drive case is made of all metal? |
| | **A.** Correct. |
| | (*Id.* at 52:1-4.) |
| | \*\*\*\*\* |
| | **Q.** The entire accessory drive case is made of metal? |
| | **A.** Correct. |
| | (*Id.* at 50:4-6.) |
| 80. Plaintiff admits that the F-80 engine starter and hydraulic pump are fully encased in all-metal housings, and that all associated hardware, fasteners and safety wire also are made of all metal. | **Plaintiff's Depo.,** Vol. II at 50:9-16; 51:19-25. |
| | **Q.** Okay. And you would agree with me, sir, that a starter is fully housed and fully encased in an all-metal housing? |
| | **A.** Correct. |
| | **Q.** And you would agree with me that the bolts and other fasteners and the safety wire associated with it are made of all metal? |
| | **A.** Correct. |
| | (*Id.* at 50:9-16.) |
| | \*\*\*\*\* |
| | **Q.** You would agree with me that the hydraulic pump is also fully housed in an all-metal housing? |
| | **A.** Correct. |
| | **Q.** You would agree with me that the hardware associated with the hydraulic pump is made of all metal? |
| | **A.** Correct. |

28

| | |
|---|---|
| | (*Id.* at 51:19-25.) |
| 81. Plaintiff admits that he does not know the composition of any gaskets present at Smoky Hill. | **Plaintiff's Depo.,** Vol. II at 57:6-12.<br><br>**Q.** With respect to any gaskets that may have been present -<br>**A.** Right.<br>-- at Smoky Hill, you do not have any personal knowledge regarding what those gaskets are made of; true?<br>**A.** True. |
| 82. Plaintiff admits that, other than metal, he does not know the composition of any products, equipment or materials with which he may have come into contact. | **Plaintiff's Depo.,** Vol. II at 53:7-11.<br><br>**Q.** Other than metal, it's fair to say that you do not know the composition of any products, equipment, or materials that you may have come into contact with; true?<br>**A.** True. |
| 83. Plaintiff admits that he does not know the brand, manufacturer or supplier of the starter, hydraulic pump, or any gaskets associated with these components. | **Plaintiff's Depo.,** Vol. II at 53:1-5; 57:14-17.<br><br>**Q.** Fair to say you do not know the brand, manufacturer, or supplier of the starter, hydraulic pump, or any gaskets associated with those components –<br>**A.** Correct.<br><br>(*Id.* at 53:1-5.)<br><br>*****<br>**Q.** And with respect to any of those gaskets at Smoky Hill, you do not know the brand or manufacturer; true?<br>**A.** True. |

**[PROPOSED] ORDER GRANTING LOCKHEED MARTIN CORPORATION'S MOTION FOR SUMMARY JUDGMENT; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**

| | |
|---|---|
| | (*Id*. at 57:14-17.) |
| 84.   All of the items Plaintiff testified to encountering when removing the engine starter and hydraulic pump are made of metal and other materials -- not asbestos. | **Jimenez Decl., ¶ 42.** |
| 85.   The F-80 engine starter is fully encased in an all-metal housing. | **Jimenez Decl., ¶ 42.** |
| 86.   The F-80 engine hydraulic pump is fully encased in an all-metal housing. | **Jimenez Decl., ¶ 42.** |
| 87.   The F-80 engine starter and engine hydraulic pump are affixed with all-metal hardware/fasteners/safety wire to the all-metal accessory mounting pads located on the all-metal accessory gear drive. | **Jimenez Decl., ¶ 42.** |
| 88.   The engine accessory gear drive is made of metal (i.e., magnesium alloy), and is flange mounted to the all-metal front truss and ring, which is integral to the forward section of the engine. | **Jimenez Decl., ¶ 42.** |
| 89.   The Military specifications applicable to the hydraulic pump accessory interface gasket do not include or list asbestos in the | **Jimenez Decl., ¶ 42.** |

| | |
|---|---|
| material composition of that gasket. | |
| 90.  Regarding Plaintiff's entire Military career, Plaintiff admits that that the above-listed duties (Material Fact Nos. 20-27, 38-40, 45-49, 61-64, 73-75, and 77-83) are the only duties he recalls performing, and/or seeing others perform, on F-80 aircraft.  Plaintiff further admits that he has provided his best testimony regarding all work he recalls being performed at each Military base he has visited or worked at during his Military career. | **Plaintiff's Depo**., Vol. II at 42:4-8; 44:8-13; 55:15-19; 58:5-24.<br><br>**Q.** Okay.  Have you now told me about all of the specific duties that you recall personally performing with respect to the removal of the F-80 aft fuselage section from the mid-fuselage section?<br>**A.** That's all I would do.<br><br>(*Id*. at 42:4-8.)<br>***** <br>**Q.** Fair to say you have now told me all of the duties you performed and all of the duties you saw others perform with respect to F-80 aircraft and its component parts while you were stationed at Williams Field, Arizona; true?<br>**A.** True, as far as I can go.<br><br>(*Id*. at 44:8-13.)<br>***** <br>**Q.** All right.  Now with respect to the F-80 that was at Smoky Hill, have you now told me all of the components and parts that you specifically recall handling and see others handle?<br>**A.** Yes.<br><br>(*Id*. at 55:15-19.) |

31

**[PROPOSED] ORDER GRANTING LOCKHEED MARTIN CORPORATION'S MOTION FOR SUMMARY JUDGMENT; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**

|  | *****<br>**Q.** Sir, have you now told me about all of the military stations that you visited or worked at during your military career?<br>**A.** Yes.<br>**Q.** Okay. And, sir, is it a fair and accurate statement that you have provided me your best testimony with respect to what you recall performing and doing at these military bases?<br>**A.** Correct.<br>**Q.** And is it fair and accurate to say that you have provided me your best testimony with respect to the type of work that was taking place at these military bases?<br>**A.** With--<br>**Q.** That you recall?<br>**A.** With the years that went by, yes.<br><br>(*Id.* at 58:5-20.) |
|---|---|

   **ISSUE:**  Lockheed Martin Is Immune From Liability Under Two Separate and Independent Doctrines: 1) Derivative Sovereign Immunity, and 2) The Government Contractor Defense.  Plaintiff's failure-to-warn claims also are barred by California's sophisticated user doctrine.

| 91. | The United States always has delegated to and relied upon outside contractors, such as Lockheed Martin, for the development and manufacture of | **Jimenez Decl.,** ¶¶ 9-12. |
|---|---|---|

| | |
|---|---|
| its Military aircraft. | |
| 92. The Military always has exercised a high degree of control, direction and involvement in the design, manufacture, testing and production of all Military aircraft, including all series of the F-80 Shooting Star ("F-80"). | **Jimenez Decl., ¶¶ 9-19.** |
| 93. The Military directed and controlled the inclusion, type, placement, and content of the finishes, markings, insignia, identifications, and warnings to be placed on all Military aircraft and aircraft components, including the F-80 aircraft and F-80 aircraft components. | **Jimenez Decl., ¶¶ 17-19.** |
| 94. The Military controlled the content of all manuals and publications governing maintenance, service, overhaul, and operation of all Military aircraft (hereinafter, "Aircraft Manuals"), including the F-80. | **Jimenez Decl., ¶¶ 16 and 18.** |
| 95. The Military published the Aircraft Manuals as Technical Orders, and controls all information contained | **Jimenez Decl., ¶ 16.** |

**[PROPOSED] ORDER GRANTING LOCKHEED MARTIN CORPORATION'S MOTION FOR SUMMARY JUDGMENT; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**

| | | |
|---|---|---|
| | in them and owns them. | |
| 96. | The United States Government's procurement of all Military aircraft has been conducted pursuant to detailed negotiated Government procurement contracts. | **Jimenez Decl., ¶¶ 9-12.** |
| 97. | Lockheed Martin and the Government entered into Government procurement contracts requiring Lockheed Martin (then, Lockheed Aircraft Corporation) to manufacture and the Government to purchase F-80 Military aircraft. | **Jimenez Decl., ¶¶ 11-14.** |
| 98. | Lockheed Martin manufactured all of its Military aircraft, including the F-80 Military aircraft, at the direction of the Government pursuant to contractually delegated authority. | **Jimenez Decl., ¶¶ 9-19.** |
| 99. | Lockheed Martin took no action in the manufacture of any Military aircraft, including the F-80 Military aircraft, that went beyond the authority delegated to it by the Government. | **Jimenez Decl., ¶¶ 9-19.** |
| 100. | All Military aircraft procurement | **Jimenez Decl., ¶¶ 9-19.** |

34

| | |
|---|---|
| contracts, including those regarding the F-80 Military aircraft, have included detailed Military-issued and/or Military-approved specifications. | |
| 101. The Government approved and required Lockheed Martin to follow detailed design, performance and material specifications when manufacturing the F-80 Military aircraft. | **Jimenez Decl., ¶¶ 9-19.** |
| 102. Lockheed Martin could not, and did not, commence manufacturing of the F-80 Military aircraft until the Government had agreed to all the specifications. | **Jimenez Decl., ¶ 11.** |
| 103. The Military-mandated specifications for the F-80 included detailed specifications for the placement of warnings, markings, and insignia on aircraft, which prohibited Lockheed Martin from placing any warnings, markings or insignia other than those approved by the Military. | **Jimenez Decl., ¶¶ 17-19.** |
| 104. The Military-mandated specifications for the F-80 Military | **Jimenez Decl., ¶¶ 12-14, 16, and 18.** |

**[PROPOSED] ORDER GRANTING LOCKHEED MARTIN CORPORATION'S MOTION FOR SUMMARY JUDGMENT; STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**

| | |
|---|---|
| aircraft included detailed direction and control over all information contained in the Aircraft Manuals. | |
| 105.  The Military published the F-80 Aircraft Manuals as Technical Orders, and the Military controls all information contained in them and owns them. | **Jimenez Decl., ¶ 16.** |
| 106.  The Military-mandated specifications for the F-80 set forth in detail, among other requirements, the equipment that the Government mandated Lockheed Martin to install in the Military aircraft.  Some of this equipment included Government Furnished Equipment ("GFE"). | **Jimenez Decl., ¶¶ 12-14.** |
| 107.  GFE is equipment that the Government selects, procures, and furnishes to the contractor, such as Lockheed Martin, with mandatory installation instructions. | **Jimenez Decl., ¶ 12.** |
| 108.  The Government selected, procured, and furnished to Lockheed Martin, for mandatory installation in the F-80, a substantial quantity of GFE, | **Jimenez Decl., ¶¶ 14 and 41.** |

| | |
|---|---|
| including, but not limited to the Allison-manufactured J-33 engine complete with multiple attached engine assemblies, subassemblies and components, including the starter assembly, hydraulic pump mounting pad cover and hydraulic pump gasket.  The Government supplied Lockheed Martin with all manuals concerning GFE; Lockheed Martin had no authority to alter or amend GFE manuals. | |
| 109. The Military had personnel stationed on-site at Lockheed Martin's manufacturing facilities inspecting and supervising the design, manufacture, testing and production of all Lockheed Martin-manufactured Military aircraft, including the F-80. | **Jimenez Decl., ¶ 15.** |
| 110. Before accepting delivery of any Lockheed Martin-manufactured Military aircraft, including the F-80, Military representatives inspected and tested the aircraft to ensure compliance with Military specifications. | **Jimenez Decl., ¶ 15.** |

37

| | |
|---|---|
| 111. The Military's acceptance of each aircraft means that the aircraft was designed and manufactured in strict accordance with Government contracts and all Military-mandated/approved specifications. | **Jimenez Decl., ¶ 15.** |
| 112. The USAF knew of potential health hazards of asbestos by at least 1944 and prescribed precautionary procedures for dealing with asbestos dust. | **Air Forces Manual No. 30,** dated July 1944, excerpts of which are attached as Exhibit 3 to Parker Decl. at p. 71 (Section C(1)); and **Ground Safety Accident Prevention Handbook**, dated June 1949, excerpts of which are attached as Exhibit 4 to Parker Decl. at p. 74 (Section 6.1-1(1) and p. 74-A[chart]). |
| 113. Army Air Forces Manual No. 30, dated July 1944, and entitled "Ground Safety Rules, A Manual for Safe Rules and Practices," recognized that "[t]he degree of harmful exposure to silica and asbestos dust is determined by four factors: by the proportion of free silica or asbestos dust found in the dust, by the size of the dust particles (the smaller, the more | **Air Forces Manual No. 30**, attached as Exhibit 3 to Parker Decl. at p. 71 (Section C(1)). |

| | |
|---|---|
| dangerous), by the concentration of the dust or the number of dust particles per cubic foot of air, and by the length of the exposure." | |
| 114. In the 1940s and 1950s, the Military established specific precautionary procedures for dealing with asbestos dust. | **Air Forces Manual No. 30**, attached as Exhibit 3 to Parker Decl. at p. 71 (Section C(1); **Ground Safety Accident Prevention Handbook**, attached as Exhibit 4 to Parker Decl. at p. 74 (Section 6.1-1(1) and p. 74-A [chart]); **Air Force Pamphlet 160-1-1,** dated September 13, 1951, excerpts of which are attached as Exhibit 5 to Parker Decl. at pp. 76 and 77 [chart]; and **Air Force Pamphlet 160-6-1**, dated September 2, 1952, excerpts of which are attached as Exhibit 6 to Parker Decl. at pp. 81-82, Par. 3(c). |
| 115. The USAF established a "Respiratory Protection Program" by 1951, which specified respiratory protection equipment for "pneumoconiosis-producing dusts," including asbestos. | **Air Force Pamphlet 160-1-1,** attached as Exhibit 5 to Parker Decl. at pp. 76 and 77 [chart]. |
| 116. By 1952, the USAF established a | **Air Force Pamphlet 160-6-1**, excerpts |

| | |
|---|---|
| specific "threshold limit value" for asbestos dust; specifically, 5 million particles of dust per cubic feet of air for eight hours per day, five days per week, 50 weeks per year. | of which are attached as Exhibit 6 to Parker Decl. at pp. 81-82, Par. 3(c). |
| 117. During the period of time that Plaintiff encountered Military Aircraft, including the F-80, Lockheed Martin had no knowledge superior to that of the United States Government of any hazards associated with the use of asbestos in general or on aircraft in particular. | **Jimenez Decl., ¶ 45.** |

## CONCLUSIONS OF LAW

1. This Court exercises original subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

2. Summary judgment is appropriate when there is no genuine dispute. Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

3. All of Plaintiff's causes of action against Lockheed Martin (negligence, strict products liability, and breach of warranty) fail for lack of causation because

40

Lockheed Martin presented undisputed evidence, including Plaintiff's own deposition testimony, that Plaintiff was not exposed to any asbestos-containing product for which Lockheed Martin may be liable. *O'Neil v. Crane Co.*, 53 Cal.4[th] 335 (2012). Even if Plaintiff encountered asbestos-containing products, there is no admissible evidence Lockheed Martin manufactured or supplied such products. Lockheed Martin's objections to the admissibility of Plaintiff's expert Mark Thomson are sustained because Mr. Thomson has no firsthand knowledge of Plaintiff's work. *See Tyler v. Foster Wheeler Co., Inc.*, MDL 875, 2011 WL 5506026 (July 5, 2011).

4. Lockheed Martin also prevails as a matter of law under its government contractor defense as set forth in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). The government contractor defense is satisfied here because the design specifications for the F-80 aircraft at issue were Government-mandated and/or approved, the aircraft conformed to those specifications, and Lockheed Martin did not fail to warn the Government of any dangers known to Lockheed Martin and unknown to the Government. Moreover, with respect to the aircraft components implicated by Plaintiff's claims, the Government not only approved reasonably precise specifications, but actually selected, purchased and provided the equipment to Lockheed Martin in the form of "Government Furnished Equipment." The government contractor defense also applies to claims of failure to warn. *See Tate v. Boeing Helicopters*, 55 F. 3d 1150, 1157 (6th Cir. 1995).

5. Lockheed Martin also prevails on its defense of derivative sovereign immunity. *See Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940); see also *City of Worcester v. HCA Management Co., Inc.*, 753 F. Supp. 31, 37 (D. Mass. 1990). Lockheed Martin has established the requisite elements of this defense by showing that it complied with validly conferred authority from the government and did not independently harm Plaintiff. There is no evidence that Lockheed

41

Martin acted beyond its validly conferred authority or that it caused harm through independent tortious conduct.

6. To the extent Plaintiffs rely on the declaration of their retained expert, Mark Thomson, to create a triable dispute of material fact regarding Lockheed Martin's government contractor defense and derivative sovereign immunity defense, Lockheed Martin's objections to Mr. Thomson's declaration are sustained.

7. Plaintiff's failure-to-warn claims are barred by California's sophisticated user doctrine.  Plaintiff, by virtue of his employment as a uniformed mechanic in the United States Air Force, is deemed to have had the same state-of-the-art knowledge as the Air Force concerning any potential health hazards of asbestos. The admissible evidence establishes that the Air Force had more knowledge of such risks than Lockheed Martin.  *See In re Related Asbestos Cases*, 543 F.Supp. 1142, 1151 (N.D. Cal. 1982).

IT IS SO ORDERED.

Dated: _Oct. 16, 2013__

By:  _____

Hon. Manuel L. Real

1

## <u>CERTIFICATE OF SERVICE</u>

2

3        I, the undersigned, do hereby certify that on the below noted date, the

4   aforementioned document was electronically filed with the Clerk of the Court of the

5   United States District Court, Central District of California using the ECF system which

6   sent notification of such filing to all counsel of record.  This document is now

7   available for viewing and downloading from the ECF system.

8

9   Dated:  October 9, 2013

10                                              */s/ Deborah M. Parker*
                                               Deborah M. Parker, SBN 228203
11                                              Glazier Yee LLLP
                                               707 Wilshire Boulevard, Suite 2025
12                                              Los Angeles, California 90017
                                               Phone: (213) 312-9200
13                                              Fax:    (213) 312-9201
                                               Email: parker@glazieryee.com
14
                                               Attorneys for Defendant
15                                              LOCKHEED MARTIN CORPORATION

16

17

18

19

20

21

22

23

24

25

26

27

28